IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DAVID KELLY, | * | |
| Petitioner, | * | |
| v. | * | CIV. NO. JKB-23-1104 |
| STATE OF MARYLAND, MARYLAND ATTORNEY GENERAL, | * | |
| Respondents. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Petitioner David Kelly filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his 2021 conviction in the Circuit Court for Baltimore City for second-degree rape. (ECF No. 1.) Respondents filed an Answer stating that the Petition should be dismissed because the claims raised by Kelly are either non-cognizable or meritless under the applicable, deferential standard of review. (ECF No. 6.)

Upon review of the record, the Court has determined that a hearing is unnecessary in this case. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, the Petition shall be denied, and a Certificate of Appealability shall not issue.

### I.  BACKGROUND

On July 17, 2019, Kelly was indicted on five counts in the Circuit Court for Baltimore City including second-degree rape, third and fourth-degree sexual offenses, second-degree assault, and

reckless endangerment. (ECF No. 7-1 at 8–9.) He was arrested on June 17, 2019, and held without bond. (*Id.* at 58.) Kelly's trial began over two years later, on July 20, 2021.

The facts established at trial were summarized by the Appellate Court of Maryland in its opinion denying relief on direct appeal. (ECF No. 7-1 at 397–01.) The events took place on June 17, 2019, in Kelly's apartment, which was located in an apartment building for senior citizens. Kelly was 65 at the time of the offense. To protect the identity of the victim, the Appellate Court referred to her as "M.J." which are not her real initials. (*Id.* at 397.) This Court will adopt the same method to protect her privacy.

M.J.'s aunt lived in the same apartment complex, on the same floor where Kelly lived. (*Id.*) M.J.'s aunt introduced her to Kelly approximately six months prior to the incident that took place leading to his arrest. (*Id.*) M.J. visited her aunt often and, while there, had spoken with Kelly casually. (*Id.*; *see also* ECF No. 7-13 at 37–41.)

On June 17, 2019, M.J. explained that she had fallen asleep at her aunt's apartment but had awakened sometime after 12:00 a.m. (ECF No. 7-1 at 398.) After exchanging text messages with Kelly, M.J. went to his apartment to get a cigarette just before 6:00 a.m. (*Id.*) When Kelly opened his apartment door, M.J. entered the apartment on the assumption he was inviting her in for a conversation. (*Id.*) As the two were talking, M.J. followed Kelly toward the bedroom where he gave her a cigarette, which she began smoking. (*Id.*)

Kelly then became angry and started yelling at M.J. (*Id.*) He then began trying to force himself on her by leaning on her and pushing down on her. (*Id.*) When M.J. tried to push Kelly off of her, they ended up on the floor where they began wrestling as M.J. continued to resist Kelly's advances. (*Id.*) She described Kelly grabbing her hair and making statements that "[t]his is going to happen whether you like it or not," indicating he was going to have sexual intercourse with her.

2

(ECF No. 7-13 at 55.) When M.J. began screaming for help, Kelly started punching her in the face and said, "I want my dick inside you" and "[i]t's going to happen . . . whether you like it or not, just let it happen." (*Id.* at 55–56.)

Kelly then ordered M.J. to pull her pants down. (ECF No. 7-1 at 398.) As M.J. got her pants down to her knees, she told Kelly that she was on her "cycle" and had "a tampon in." (*Id.*) Kelly responded that he did not care and told her to "take that out." (*Id.*) M.J. complied. (*Id.*) At this time, she also managed to call 911. (*Id.*) M.J. began yelling for help after dialing 911, but when Kelly realized she was on the phone, he began hitting and punching her in the face, resulting in bruises and scratches. (*Id.*)

Kelly then performed oral sex on M.J. against her will. (*Id.* at 399.) Thereafter, Kelly penetrated M.J.'s vagina with his penis. (*Id.*) Kelly then punched M.J. in the face, knocking one of her teeth out. (*Id.*)

After the assault, Kelly became remorseful and apologetic. According to M.J., Kelly said he was going to kill himself and gave her the keys to his apartment so that she could find his body. (*Id.*) M.J. put her clothes back on, left the tampon on the floor of the bedroom, took Kelly's keys with her, and went back to her aunt's apartment. (*Id.*)

M.J. told her aunt what occurred and then went to the apartment manager's station to report that Kelly had raped her. (*Id.*) The manager then called the police. (*Id.*) Kelly also called the police and reported that M.J. had stolen the keys to his apartment, food, and several other things. (*Id.*) After police arrived on the scene and spoke with M.J., she was transported to Mercy Hospital where a forensic nurse conducted a Sexual Assault Forensic Examination ("SAFE") to collect evidence from the sexual assault. (*Id.*)

The nurse who conducted the examination of M.J. testified that she observed a cut to M.J.'s upper lip, swelling around one of her eyes, and a missing tooth. (ECF No. 7-13 at 136–38.) A genital and cervical exam revealed redness to M.J.'s cervix consistent with vaginal penetration. (ECF No. 7-1 at 399.) In addition, the nurse collected blood and urine samples, various swabs of different areas of M.J.'s body, pubic hair combings, and her underwear. (*Id.*) All the items collected were placed into sealed envelopes and the nurse gave the entire SAFE exam kit to the Baltimore City Police Department. (*Id.*)

Detective Kelsey Roberts, the lead detective assigned to the case, went to Mercy Hospital and met with M.J. before the SAFE exam was conducted. (ECF No. 7-14 at 42.) Detective Roberts also observed the injuries to M.J.'s mouth and described her demeanor as "visibly shaken," upset, and very tired. (*Id.* at 50–51.) Detective Roberts also observed the small bruise under M.J.'s left eye, an abrasion on top of her lip, blood and abrasions inside of her mouth, and a missing tooth. (ECF No. 7-1 at 400.) She received the sealed SAFE exam kit and submitted it to the Evidence Control Unit. (ECF No. 7-14 at 53.) Detective Roberts then obtained a search and seizure warrant for Kelly's apartment, where evidence was collected. (*Id.* at 54.)

The State's case included testimony from a Crime Lab Technician, a Forensic Scientist, and a DNA Analyst regarding the collection of evidence for testing, the serological processing of the evidence collected during the SAFE exam, the evidence sampled for DNA testing, and the analysis of DNA profiles found. (ECF Nos. 7-13 at 244–65; 7-14 at 12–36, 101–260; 7-15 at 7–46, 48–112.)

Kelly did not testify. (ECF No. 7-15 at 127.) The sole witness for the defense was the Community Manager for the apartment complex where Kelly lived. (*Id.* at 146–68.) The testimony was offered to bolster the defense's theory that M.J. was not credible.

4

On July 27, 2021, the jury reached a verdict of guilty on the charge of second-degree rape. (ECF No. 7-17 at 4.) On December 15, 2021, Kelly was sentenced to serve 15 years with two years suspended, followed by two years of probation. (ECF No. 7-18 at 28.)

Kelly filed a direct appeal in which he raised four claims alleging trial court error. (ECF No. 7-1 at 227–70.) The four questions he presented were:

> (1) Did the trial court commit reversible error in failing to comply with Maryland Rule 4-215(e)?
>
> (2) Was Appellant's right to confrontation under the Sixth Amendment and Article 21 violated?
>
> (3) Did the trial court commit reversible error in the conducting of *voir dire*?
>
> (4) Did the trial court err in denying Appellant's motion to dismiss for violation of his constitutional and statutory right to a speedy trial?

(*Id.* at 228.) In a 39-page unreported opinion issued on January 4, 2023, the Appellate Court of Maryland affirmed Kelly's conviction. (*Id.* at 396–435.) The court's mandate issued on February 7, 2023. (*Id.* at 450.)

Kelly's self-represented petition for writ of certiorari to the Maryland Supreme Court raising the same claims decided by the Appellate Court was denied on April 25, 2023. (*Id.* at 436–48, 451.) Kelly has not filed a state post-conviction petition, but the claims he raises in the petition filed with this Court mirror those he raised on direct appeal. (ECF No. 1 at 6.) Each of those claims are set forth and analyzed below.

## II.     LEGAL STANDARDS

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). The standard is "difficult to meet," and requires courts

5

to give state court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) (explaining that state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."

6

*Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (internal quotation marks and alterations omitted); *see also Renico v. Lett*, 559 U.S 766, 773 (2010) ("[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.").

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010). Further, federal habeas relief is unavailable for claims that a state court violated only state, and not federal, law. *See Wilson v. Corcoran*, 562 U.S. 1, 1 (2010) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law."). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (citations omitted).

## III. DISCUSSION

The four claims Kelly presents in this Court mirror, for the most part, those he raised on direct appeal in the Appellate Court of Maryland. Respondents contend the claims are either not cognizable, meritless, or procedurally defaulted and urge this Court to deny the Petition. (ECF No. 6.) Kelly was given the opportunity to respond to Respondents' claim that a portion of his first claim was procedurally defaulted, and he filed a response. (ECF Nos. 14, 15.) Each of Kelly's claims are addressed below in light of the standard of review set forth *supra*.

### A. Maryland Rule 4-215(e)

Kelly first claims that the trial court failed to comply with Maryland Rule 4-215(e) after "a number of letters" were sent to the court raising concerns about the case and the need for a pro bono attorney to be assigned. (ECF No. 1 at 6.) Kelly claims the trial court failed to address these letters. (*Id.*) Respondents assert that this claim is not a cognizable federal claim because it alleges the violation of a state procedural rule, and to the extent Kelly is attempting to raise a federal constitutional claim, it is procedurally defaulted. (ECF No. 6 at 24–33.) Respondents are correct on both counts.

In pertinent part, Maryland Rule 4-215(e) states that "[i]f a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request." Addressing this same provision of Maryland law, this Court has previously explained that "[v]iolation of the procedural requirements of a state evidentiary rule, alone, does not constitute a cognizable basis for federal habeas corpus relief." *Yarborough v. Bishop*, No. JKB-15-1337, 2017 WL 35435, at *19 (D. Md. Jan. 4, 2017) (citing *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010)). Accordingly, Kelly's claim that the trial judge violated Md. Rule 4-215(e) is not cognizable in this federal habeas action.

Perhaps understanding this requirement, Kelly argues that the alleged violation of Md. Rule 4-215(e) violated his Sixth Amendment right to counsel of his own choosing. (ECF No. 15 at 3.) However, this claim is procedurally defaulted. As relevant here, procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mahdi v. Stirling*, 20 F.4th 846, 892 (4th Cir. 2021) (citing *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998)). Kelly did not raise a Sixth Amendment argument in his direct appeal to the Appellate Court of Maryland.

8

(*See* ECF No. 7-1 at 242–49, 381–89.) Rather, his argument on direct appeal was limited to whether one of his letters triggered the requirements of Md. Rule 4-215(e). (*Id.*) Thus, under Maryland law, Kelly waived this constitutional claim. *See Johnson v. Maryland*, No. JKB-20-856 2023 WL 2600200, at *3 (D. Md. Mar. 23, 2023) (citing Md. Code Ann., Crim. Proc. § 7-106(b)). As a result, to the extent that compliance with the rule implicates the Sixth Amendment right to counsel, that part of the claim is procedurally defaulted because it was not squarely presented to the Appellate Court for its consideration.

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, *Juniper v. Davis*, 74 F.4th 196, 209 (4th Cir. 2023), or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of one who is actually innocent, *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986). "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488.

The Court expressly instructed Kelly to present argument as to whether his constitutional claim should be considered even though it is procedurally defaulted. (ECF No. 14.) However, he has not provided the Court with an adequate basis to find cause for his failure to raise the Sixth Amendment claim, nor has he demonstrated that prejudice would result from this Court's failure to consider this claim on its merits. (*See generally* ECF No. 15.) Accordingly, the Court may not consider the procedurally defaulted Sixth Amendment claim.[1]

---

[1] To the extent that Kelly holds any residual dissatisfaction with his trial counsel's performance, he has an available state remedy through a post-conviction petition. *See* Md. Code Ann. Crim. Proc. § 7-102. He is reminded, however, that he may not file a second or successive federal habeas petition without first seeking and being granted leave from the United States Court of Appeals for the Fourth Circuit.

9

### B. Sixth Amendment Confrontation Clause

Next, Kelly asserts that his Sixth Amendment right to confront the witnesses against him was violated because the trial testimony about forensic evidence "was from witnesses who did not do any testing" and were "not around when it was done" but was instead read from reports prepared by the people who performed the actual tests. (ECF No. 1 at 6.) Respondents assert that this claim does not survive scrutiny under the requisite deferential standard of review. (ECF No. 6 at 33–55.)

This claim was reviewed *de novo* by the Appellate Court of Maryland in its opinion denying Kelly's direct appeal. (ECF No. 7-1 at 406–18.) The underlying facts for the claim were summarized by the court as follows:

> At trial, Taylor Hall ("Hall"), a forensic scientist with the Baltimore City Police Department Crime Lab was admitted as an expert in the field of forensic serology. Hall testified that her responsibilities include screening evidence samples for the possible presence of biological fluids, including blood or semen, and identifying suitable samples for epithelial* or skin cells and saliva. She explained that once she is assigned a case, she retrieves the evidence from a vault, performs the analysis, and generates a report. After a report is generated, another analyst performs a technical review. Hall described the role of a technical review as follows:
>
>> The technical review is when another competent analyst in the field . . . look[s] at . . . the entire case file to make sure that all of [the] technical procedures were followed in terms of testing the evidence, the results, and making sure the results that [were] received are translated correctly and completely into the report.
>
> Hall testified that she completed a technical review of the original analyst's case file to make sure that "all of the technical protocols were followed in terms of testing the results that were recorded" and to "mak[e] sure that all the information was translated correctly and accurately to her report." While Hall did not repeat or redo any of the tests that were performed by the original analyst, she had access to all of the data the original analyst used and relied on in coming to her conclusions. Hall explained that the reason the tests are not repeated during a technical review is "[b]ecause we're all competent analysts and we are required to write down all of our results and record everything so there is no need to retest any evidence in the technical review process."

> Hall made sure that all the steps the original analyst took during her analysis were appropriate by "looking at the case file to determine what samples she had, how she screened them, and making sure that the tests that she used were the appropriate ones for those particular samples." Hall testified regarding the analyses performed by the original analyst on evidentiary items including, but not limited to, various swabs taken from both M.J. and Kelly.\*\* Hall testified as the technical reviewer at trial because the original analyst in this case, Amanda Pasay ("Pasay") was unavailable.\*\*\*
>
> Virginia Sladko, a Baltimore City Police Department Forensic Laboratory DNA analyst was also admitted as an expert at trial. Sladko received and analyzed various samples, including the external genital, breast, and nipple swabs collected from M.J. The results of these samples yielded a DNA profile consistent with M.J. and Kelly.
>
> ---
> \* Epithelial refers to the layer of cells that cover most surfaces of the body. Epithelial, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/epithelial(last visited Dec. 21, 2022).
> \*\* Hall testified regarding the following evidentiary items: 1) vaginal swabs; 2) vaginal cervical swabs; 3) external genitalia swabs; 4) peri-anal swabs; 5) pubic hair combings; 6) underwear from the SAFE kit; 7) right breast and nipple "licking" swabs; 8) a blood sample from M.J.; 9) penile swabs; 10) finger and hand swabs; and 11) a blood sample from Kelly.
> \*\*\* The record indicates Pasay was unavailable to testify because she was on maternity leave.

(*Id.* at 407–08.) The Appellate Court of Maryland held that Hall's testimony did not violate the Confrontation Clause because Hall was the "functional equivalent of a second author." (*Id.* at 415.) In reaching that conclusion, the Appellate Court examined the well-established law regarding rights under the Confrontation Clause. (*Id.* at 409–14.)

The Confrontation Clause provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has interpreted the Clause as prohibiting the admission of "testimonial" statements from an unavailable declarant, unless the defendant had a prior opportunity to cross-examine that declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for

cross-examination"). Although the definition of "testimonial" has proven to be nebulous, a statement is likely testimonial when its primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

The Supreme Court has decided a line of cases addressing how this definition applies to forensic reports and their certifications. Most relevant here, in *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011), the Supreme Court held that the testimony of a forensic analyst called as an expert to testify as to the process and procedures involved in a blood alcohol test but who had not observed or reviewed the actual test, could not be used to support introduction of the report through his "surrogate testimony." This was because the would-be expert witness would be unable to "convey what [the actual analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." *Id.* at 661–62. In a concurring opinion, Justice Sotomayor distinguished the witness at issue in *Bullcoming* from one where "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 672 (Sotomayor, J., concurring).

In Kelly's case, the trial court determined that Hall could testify to the contents of the report, but the report itself could not be admitted into evidence. (ECF No. 7-1 at 415.) The Appellate Court found that Hall was the functional equivalent of a second author of the report about which she testified and therefore Kelly's confrontation rights were not violated when Hall was allowed to testify. (*Id.*) The Appellate Court based its conclusion on Hall's testimony during which she confirmed under cross-examination that she "signed off" as the "technical reviewer" of the report. (*Id.* at 416.) The analysis applied by the Appellate Court was largely based on *State v. Miller*, 475 Md. 263, 293 (2021), in which the Supreme Court of Maryland reviewed United States Supreme Court precedent and formulated a "degree of involvement" test to determine if a witness

is qualified to convey information contained in a report. The three-prong test requires the putative witness to: (1) thoroughly review all the data that the original analyst used; (2) independently determine whether or not the results and conclusions were correct; and (3) if they were correct, sign off on the report's issuance. *Id.* The Appellate Court found that Hall reviewed all the data Pasay used, independently determined Pasay's results and conclusions were correct, and signed off on the report's issuance. (ECF No. 7-1 at 417.)

To warrant federal habeas relief, Kelly must establish that the Appellate Court's ruling was contrary to, or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, or that it was based on an objectively unreasonable assessment of the facts. *See* 28 U.S.C. § 2254(d). This Court is precluded from issuing "the writ simply because [the Court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). The standard is a highly deferential one and "demands the state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2000).

Here, the Supreme Court has never ruled on this precise issue. *Miller*, 475 Md. at 286 (citing *Bullcoming*, 564 U.S. at 672 (Sotomayor, J., concurring)). Thus, there is no clearly established federal law that the Appellate Court could have unreasonably applied or ruled contrary to. Regardless, the Appellate Court's decision was well-reasoned and persuasively explained why both Maryland and United States Supreme Court precedent led to its conclusion. In particular, the court considered *Bullcoming* and *Miller*. (ECF No. 7-1 at 411–14.) It noted the striking similarities between the instant case and *Miller* and found that all three prongs of *Miller*'s "degree of involvement" test were met. (*Id.* at 415–17.) This Court agrees with the Appellate Court of Maryland's application of the law.

The Court also finds that the Appellate Court's assessment of the facts was objectively reasonable. At trial, Hall stated that she was a technical reviewer, had reviewed all the underlying data, described the testing process, and explained why she adopted Pasay's conclusions. (ECF No. 7-15 at 7–12, 29.) She then signed off on the forensic report. (*Id.* at 40.) The Appellate Court credited this testimony in determining that Hall was a technical reviewer. (ECF No. 7-1 at 417.) The Court finds this determination to be reasonable. Therefore, habeas relief is denied on Kelly's Confrontation Clause claim.

### C. Failure to Excuse Juror 2187

Kelly assigns error to the trial court's failure to excuse prospective juror 2187 from the jury after he answered questions indicating that he was a police officer at the time of the incident, was somewhat familiar with the incident with which Kelly was charged, had strong feelings about rape cases, and knew two of the police officers involved in the case and probably one of the forensic scientists. (ECF No. 7-12 at 83–87.) Because the juror assured the trial court that he could be impartial and afford Kelly the presumption of innocence if he were selected to sit on the jury, the trial court denied defense counsel's motion to excuse the juror for cause. (*Id.* at 87–89.) Later, during the jury selection process, Kelly's trial attorney used a peremptory strike to exclude the juror from the jury. (*Id.* at 342.)

The Appellate Court of Maryland rejected Kelly's claim that it was error for the trial court to deny his motion to strike this juror for cause, reasoning that the "trial judge was in the proper position to assess Juror 2187's credibility when the juror made assurances that he could be fair and impartial in deciding the case." (ECF No. 7-1 at 426.) While Kelly argues in this Court that the trial court "allowed a Baltimore police [officer] to stay on [the] jury knowing he knew everyone involved with the case as well as [had] a problem with the type of case," (ECF No. 1 at 6), it is

14

clear the juror did not remain on the jury (ECF No. 7-12 at 342). Thus, any argument Kelly attempts to make that his trial was unfair because this juror was allowed to remain on the jury is incorrect; Juror 2187 did not participate in the trial in any way.

To the extent that Kelly argues that his constitutional right to an impartial jury was violated because he had to use a peremptory strike instead of a for-cause strike, federal habeas relief is equally unavailable. The Supreme Court has held that the "right to exercise peremptory challenges in state court is determined by state law." *Rivera v. Illinois*, 556 U.S. 148, 152 (2009). And "[t]he loss of a peremptory challenge due to a state court's good-faith error" cannot rise to "a matter of federal constitutional concern." *Id.* at 157. As explained *supra*, only claims that allege violations of the federal Constitution or federal laws are cognizable for federal habeas relief. Thus, Kelly's claim here is insufficient to warrant federal habeas relief.

### D. Speedy Trial Rights

Finally, Kelly alleges that his constitutional right to a speedy trial was violated. (ECF No. 1 at 6.) Kelly was indicted on July 17, 2019. The state offered a plea deal on November 14, 2019, which Kelly rejected. On January 13, 2020, the state offered another plea deal, which Kelly again rejected. On that date, the state also moved for a continuance of the trial date until March 23, 2020. The trial court granted this motion, finding good cause because the prosecutor was assigned to another trial. The trial was then delayed five more times—until July 20, 2021—because of COVID-19. Kelly asserted his speedy trial rights multiple times after he was indicted, including in a motion filed on May 13, 2021. The trial court denied the motion.

On direct appeal, the Appellate Court of Maryland examined the four-factor balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). (ECF No. 7-1 at 427.) This test considers (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and

(4) the prejudice to the defendant. *Barker*, 407 U.S. at 530. The Appellate Court noted that the Maryland Supreme Court previously held in *State v. Kanneh*, 403 Md. 678, 688 (2008) that a delay of one year and 14 days is presumptively prejudicial. (ECF No. 7-1 at 427.) The length of delay in Kelly's case, 25 months, qualified for further balancing of the length of delay against the remaining factors, in the Appellate Court's view. (*Id.*)

The Appellate Court next looked at the reason for the delay and noted that in *Barker*, the Supreme Court indicated that "different reasons should be weighed differently." (ECF No. 7-1 at 428.) The *Barker* Court observed that:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531. Applying this standard to Kelly's case, the Appellate Court found that the delays in his case could be broken down into "four segments." (ECF No. 7-1 at 428.) The court reasoned that during the first seven-month period, between the date of Kelly's arrest and January 13, 2020, when the trial court postponed the case the first time, there is "nothing to suggest that the parties were engaged in anything other than 'normal pre-trial preparation' during this time." (*Id.* (quoting *Malik v. State*, 152 Md. App. 305, 318 (2003)).) The Appellate Court found that under Maryland law, time spent in pre-trial preparation is neutral and is not charged against the State or the defense. (*Id.*)

The second segment of the delay occurred between January 13 and March 23, 2020. (*Id.* at 429.) The trial court found good cause for a postponement on January 13, 2020, because the prosecutor was unavailable due to another trial. (*Id.*) The Appellate Court noted that "[n]either

16

party has argued nor does the record show that the prosecutor's unavailability was an intentional action by the State." (*Id.*)

The third segment is an 11-month delay between March 23, 2020, and February 26, 2021, which involved five trial dates that were postponed due to the COVID-19 pandemic. (*Id.* at 429.) The fourth and final segment of the delay occurred between February 26, 2021, and the first day of Kelly's trial on July 20, 2021. (*Id.*) The Appellate Court noted that jury trials were suspended in the state due to the pandemic from March 16, 2020, through October 5, 2020; and November 16, 2020, through April 23, 2021. (*Id.* at 430.) The court rejected Kelly's reliance on *Kurtenbach v. Howell*, 509 F. Supp. 3d 1145, 1152 (D.S.D. 2020), holding that the defendant's right to a speedy trial had been violated because the COVID-19 pandemic was not a valid reason for justifying an 18-month delay. (*Id.*) The Maryland court reasoned that, unlike the South Dakota state court that had apparently "take[n] advantage of its own failures to follow scientific facts and safeguards in entering blanket denials of the rights of speedy trials," Maryland was proactive when faced with the pandemic. (*Id.* (quoting *Kurtenbach*, 509 F. Supp. 3d at 1152).) Thus, the Appellate Court found the third and fourth segments of the delays neutral and attributable to neither party. (*Id.* at 431.)

After weighing the reason for the delay, the Appellate Court observed that Kelly asserted his speedy trial rights and that the state did not contest that fact. (*Id.* at 431.) The court further observed, however, that under *Barker* this factor "carries only slight weight, and in light of the other circumstances, such as the delays due to the COVID-19 pandemic, this factor is not dispositive." (*Id.* at 432 (citing *Hallowell v. State*, 235 Md. App. 484, 519 (2018) (internal quotation marks omitted)).)

17

Lastly, the Appellate Court examined whether Kelly suffered prejudice as a result of the delay. (*Id.* at 432.) Under *Barker* there are three interests relevant to the "assessment of whether a defendant suffered prejudice: (i) 'oppressive pretrial incarceration;' (ii) 'anxiety and concern of the accused;' and (iii) 'the possibility that the defense will be impaired.'" (*Id.* (quoting *Barker*, 407 U.S. at 532).) While the most serious of those interests is the possible impairment of the defense, the Appellate Court found that Kelly had failed to point to any specific instance of impairment to his defense and had simply emphasized that the delay "contributed to more than a little anxiety." (*Id.* at 433.) This echoed the trial court's finding that it heard "no reason why Mr. Kelly's defense [was] impaired by this delay." (ECF No. 7-10 at 30.)

The analysis by the Appellate Court of Maryland of Mr. Kelly's constitutional claim does not rely on an objectively unreasonable assessment of the facts, nor is it an unreasonable application of, or contrary to, clearly established federal law. The majority of the pre-trial delay was due to COVID-19, which "is a valid reason for delay." *United States v. Pair*, 84 F.4th 577, 589 (4th Cir. 2023) (collecting cases from other Circuits finding that COVID-related delays cannot be attributed to the government). The Appellate Court also found no evidence that Kelly's defense was prejudiced, and Kelly did not point to any additional evidence of prejudice in his Petition. Overall, the Court finds that the Appellate Court thoroughly and carefully applied the *Barker* factors. Thus, under the applicable deferential standard of review, habeas relief is denied on this claim.[2]

---

[2] Although both the trial court and the Appellate Court also analyzed Kelly's claim under *State v. Hicks*, 285 Md. 310 (1979) or the *Hicks* rule codified as Md. Code Ann. Crim. Proc. § 6-103 and Md. Rule 4-271, that claim is based solely on state law and is not a cognizable basis for federal habeas relief. Thus, the state courts' analyses are not examined here. *See Torrence v. Lewis*, 60 F.4th 209, 214 (4th Cir. 2023) (finding that federal habeas petitioner "cannot receive federal habeas relief solely for an error of state law, even if one exists").

### E. Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 580 U.S. 100, 115 (2017). Kelly "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c)(2). Kelly may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

## IV. CONCLUSION

For the foregoing reasons, the Petition for Writ of Habeas Corpus (ECF No. 1) shall be denied and a certificate of appealability shall not issue. A separate Order follows.

Dated this __16__ day of October, 2025.

FOR THE COURT:

_/s/ James K. Bredar_
James K. Bredar
United States District Judge